This is a case about a mother and a daughter who were subjected to, I guess, a long alleged, long time abuse from the biological father of Brieanna Gunsay. They were able to escape from this situation to Canada, begin a new life. Ms. Brieanna Gunsay was then diagnosed with a serious medical issue, specialized treatment in the United States. They came back, and this is where this case arose. They began treatment. Do we know what that medical condition is? Is that revealed? It is something that I have never heard of, Your Honor, but it requires hyperbaric treatments and certain medication. But it has a debilitating effect upon her, which causes her to be able not to function for periods of time, sleep constantly, and she's in constant pain. But as they sought treatment from a doctor by the name of Mozayeni in Maryland, Dr. Mozayeni apparently decided to do some background checking on his patient. And when he did so, what he did was he ran across a website that had been started by her biological father, Metin Gunsay, who lived in Utah, a very influential individual. And on this website, he suggested that his daughter had been abducted. There had been ongoing disputes about this, but his daughter Brieanna now was an adult and was being cared for by her mother as she received treatment. Dr. Mozayeni took it upon himself to contact Metin Gunsay to discuss with him the fact that the daughter that he was writing about stalking on the internet was treating with him. And he then set upon basically setting the daughter up to be accosted by Metin Gunsay and Mr. Gunsay's mother, Linda Williams. And so he set up a sham appointment at his office and informed Metin Gunsay and Linda Williams of the date and time of that appointment. They flew to Maryland from Utah, contacted law enforcement officials in Maryland, gave them a heads up as to when she would be at the doctor's office. There was, in our view, a warrant, or two warrants actually, that were in the system for Kristen Gunsay relating to her custody disputes. And one of those warrants was for kidnapping, and another one was a state warrant for perjury and obstruction, I believe it was. The warrants were, in our view, totally invalid and had been somehow caused to be issued by Mr. Gunsay. But obviously the law enforcement officers did not have the, they were not required to verify what was perceived as warrants. So they got together a crew under the direction of Plummer, who was one of the named defendants, and they set up to accost or arrest Ms. Kristen Gunsay at the office of Dr. Moziani, where they knew that Ms. Brianna Gunsay would be in their presence. For reasons that are not clear, the other officers, two of them, Henderson and Schultz, decided to take along Ms. Linda Williams and Metin Gunsay to the location of Dr. Moziani's office for the purported purpose of having them identify Ms. Kristen Gunsay. Although Officer Plummer, or Deputy Plummer, indicates that he didn't need that because he had a photograph of her, and he recognized her at any event when he got to the location. They arrest Ms. Kristen Gunsay, and during the course of their arrest, she's dragged from the vehicle at gunpoint, thrown to the ground, although she's compliant. She never makes any attempt to resist. She never makes any attempt to flee. There's no basis or necessity for any use of force, but there's use of force. Ms. Brianna Gunsay, who was in the rear passenger seat of the vehicle, is ordered from the vehicle at gunpoint, surrounded by officers at gunpoint, held at gunpoint. She's manhandled, pushed, she's shoved, and surrounded by officers. Plummer takes Ms. Kristen Gunsay, handcuffs her, and takes her for processing. He and Kristen Gunsay are there for about five minutes after the stop had occurred. Brianna Gunsay was held for another hour by these officers and forced to interact with Linda Williams, whom she did not want to interact with, and they asked her to interact with Metton Gunsay, the biological father, which she emphatically refused to do, repeatedly told them no. By all accounts, everybody agreed that she was not going to be in his presence voluntarily. They tried to make her acquiesce to this. They held her against her will. They refused to allow her to leave, all of the time subjecting her to pushing and shoving, and so that was the basis of the lawsuit in this particular case. There were charges, there were accusations brought against Henderson and Schultz based upon the false arrest of Ms. Kristen Gunsay based upon excessive force. The trial court dismissed those claims on a motion to dismiss with respect to the false arrest and the excessive force. And while it is conceded that based upon the fact that there was a warrant, although we believe it was erroneously issued, that they had a reasonable basis to rely upon it, and therefore the dismissal based upon the false arrest with regard to Kristen Gunsay was not inappropriate. However, the dismissal with regard to the use of force was clearly inappropriate because the complaint clearly alleges that force was used against her and it was not necessary. And for those reasons, we say that the motion to dismiss with respect to Ms. Kristen Gunsay as to the use of force was improper. As to defendant Moziane, the doctor, there was a claim for intentional infliction of emotional distress and unwarranted invasion of privacy. The trial court dismissed that claim on the basis that it had been dealt with in the state court and therefore was precluded by collateral estoppel. That was erroneous as a matter of law because the dismissal with regard to the claim in the state court was without prejudice by all accounts, even the order. Dismissing it in a dismissal without prejudice is not a final judgment and therefore it does not count as collateral estoppel and does not apply. There was also the other argument that it did not comply with the health claims and health arbitration act. And in that particular case, when the case was initially filed, it did not, but it did go through health arbitration and an order was issued allowing the matter to be brought in court based upon the waiver that was obtained. The court dismissed the actions with regard to Linda Williams and Metten Gunsay with regard to Brianna's action against them on the basis of collateral estoppel because there had been a dismissal issue in the state court on previous claims and we don't disagree with that. We don't disagree with that in terms of it applying to Ms. Linda Williams because the court did dismiss that case in its entirety with prejudice, but it was no dismissal with regard to Metten Gunsay. With regard to Kristen Gunsay, she was not part of that lawsuit. There was no privilege between the parties and therefore that should not have been dismissed. The trial court denied the motion to dismiss with respect to Schultz and Henderson, but then subsequently granted the motion with regard to them based upon the claims of Brianna Gunsay indicating that there were no undisputed facts and that could not be followed from the truth. The Christian Gunsay and Brianna Gunsay testified that she was manhandled, she was shoved, she was held against her will, there was no basis for an arrest of her, there was no basis for her seizure. She was an adult at the time and the actions that were perpetrated against her were entirely inappropriate because no police officer has the right to hold somebody, to force them to talk to anybody, particularly to talk to private citizens even if it does happen to be your biological father and your paternal grandmother. That is not the role of law enforcement, that was inappropriate and it should not have happened and especially should not have happened to a young woman who was seeking medical treatment for a serious medical condition in the parking lot of the office of her doctor. The trial court's dismissal or granting of summary judgment with respect to that had no basis under the law and had the trial court reviewed the evidence in the light most favorable to the plaintiff, then that would not have happened and it did not do so. That is the basis of the claims, that is why this matter is before the court at this point.  Thank you. All right, we hear from the other side here, Mr. Levin. Please tell us who you represent right at the outset, will you? Jason Levine, Assistant Attorney General for Maryland on behalf of Lieutenant Henderson and Sergeant Stultz. Thank you, Your Honor, may it please the court. The district court here correctly ruled after a full opportunity for discovery that the plaintiff's theory, which was about rogue police officers and fake warrants and this conspiracy between Breonna Gunse's father and law enforcement was just not supported by the record at all. And in fact, the district court went so far, and I'll use Judge Motz's words, to describe at least a portion of that argument as frivolous. The Gunse's have maintained and even continued... They were the arresting officers? They were not the arresting officers. Sergeant Plummer was the deputy that arrested Kristen Gunse. Lieutenant Henderson and Sergeant Stultz were there in more of a supportive capacity and frankly took no action other than a brief consensual encounter between Lieutenant Henderson and Breonna Gunse. He approached her and said, your father's here, would you like to speak with him? He said very candidly, she was adamant she did not want to speak with him. And he said, okay, would you like to speak with your grandmother? And she agreed. And she speaks with the grandmother very briefly. So this theory that Breonna was somehow forced to interact with her father, there's no record evidence of that. He was there. They didn't bring him over to her. They didn't force her into a vehicle with him. There was nothing more than a question. Would you like to speak with him? No? Okay. And they moved on. Why were they doing that? Because the doctor asked them to? The doctor didn't ask them to. And there's some evidence in the record that her father contacted the sheriff's office and said, I have information that my ex-wife, Kristen Gunse, is going to be at this location at a particular time. There are warrants for her arrest. They verified that. It is beyond good faith debate that those warrants are valid. They were issued, one by a federal court in Utah, one by a state court. And for that reason, they set up this operation to take her into custody. And the record contains an e-mail chain. You're talking about taking the mother into custody. Just the mother into custody. Then why are you doing this to the young lady? She was going to be there. She was going there for a medical appointment. The idea was the Gunse's, the father and the grandmother, wanted to go to see if she would speak with them. And the record is clear. Why are the officers acting on behalf of the father and the grandmother? Well, they're acting on behalf of the court, in essence, because they're serving two arrest warrants. There weren't any arrest warrants for the daughter. And if Kristen, the mother, wasn't going to be there, this would have never happened. They would have never been there to begin with. They were there to arrest Kristen Gunse, and Breonna was there. And I think, as Judge Motz pointed out, there's nothing improper about the father going with and having them ask a question. Would you like to speak with your father? The record is clear that he told law enforcement he would not interfere. That's in Lieutenant Henderson's affidavit, and it's also in an e-mail chain with the sheriff's office. And he didn't interfere. There's no evidence that he did anything at the scene at all. Wasn't there testimony from the daughter that she was there for more than an hour, essentially against her will, that she was being detained by the officers for more than an hour? She was not clear on the timeline. When you asked her generally, how long were you there, she would say it was more than an hour. But in her deposition, when we broke down a chain of events, it was clear that that was not accurate. Let me ask you, once the mother had been removed from the scene, the daughter was, how old was she? She was in her early 20s. At least past 21, I guess. She was 22 or something? At least she was 21 or 22. And so at that point, is there any indication she was incompetent or she, I mean, she was not able to do it? I mean, why would you, that part is fuzzy, as to why the officers would stay with her and seem to be assisting either the father or whomever. I mean, what was that about? What they were doing was inventorying the vehicle because they showed up in a vehicle. That vehicle was impounded because Brianna, the daughter, did not have a driver's license and she couldn't drive it from the scene. So they're there, and that's really the sum total of Sergeant Stoltz's involvement. All he did was impound the vehicle. So her testimony that she was being detained for an hour, what does that mean? That she was just not telling the truth? It contradicts other aspects of her testimony where she describes the chain of events, being told to get out of the vehicle, which she does under her own power. And what she pleads is, I was held at gunpoint and forced to interact with my father. In her deposition, she said that's not what happened at all. There were no guns drawn at that point. What ultimately happened with all these warrants and all? What happened in this case? I don't know what happened when it went back to the Utah authorities, but from the sheriff's office standpoint, they served the warrant. Kristen Gunsey was transported to the detention center. They asked Brianna Gunsey two questions, do you want to speak with this person or that person? They impounded the vehicle and they left the scene. They had nothing more to do with it. I just want to point out, if I may, one quick point on bystander liability. How many officers were there? There were roughly eight or nine. Eight or nine officers to execute two warrants on one woman. It was the U.S. Marshals Capital Area Task Force. One federal warrant sort of invoked their involvement. May I make a quick point on bystander liability? I see my time is up. Thank you. Bystander liability is the theory of the plaintiff's case now on appeal. That was not pled and it was not argued below. There is no evidence at all that any of these deputies stood by and watched any constitutional violations. Are you arguing on behalf of someone else now? I'm arguing also, this is still Lieutenant Henderson and Sergeant Stoltz, because they have on appeal, the Gunseys have said, well, because there's nothing in the record indicating they did anything personally, and that's really undisputed, that they were. Hasn't your time expired on that? It's expired. I was simply seeking more time to address that if the court has concluded. You've got it in your briefs. Thank you, Your Honor. Ms. Farber. Good morning, Your Honors. May it please the court, Assistant United States Attorney Melissa Farber on behalf of Sergeant Troy Plummer. Plaintiff's case, as it concerns Sergeant Plummer, boils down to an uneventful five minutes in the arrest of Kristen Gunsey. How's the government representing him? Sergeant Troy Plummer was a deputized U.S. Marshal. A special deputy or something? All I know is that he was deputized as part of the U.S. Marshal Task Force, and that's why we step in. He's a sergeant in the state or city police. That's correct. I'm sorry. Go ahead. That's correct. So the main question for this panel, as it involves Sergeant Plummer, is whether in the five minutes that Sergeant Plummer was on the scene with Kristen Gunsey and Brianna Gunsey, whether taking the facts most favorable to the appellant, there is a genuine dispute that Sergeant Plummer satisfies the elements of bystander liability as set forth by Your Honor Judge King in the Randall case. So that means that there must be no dispute that Sergeant Plummer knew a fellow officer was violating an individual's constitutional rights, that he had a reasonable opportunity to prevent that harm, and that he chose not to do so. And there is no genuine dispute that these elements are not satisfied in this case. The district court correctly recognized that and also correctly recognized that even if there was a constitutional violation, qualified immunity would attach. Now moving to the first point about bystander liability, there's no genuine dispute of fact regarding Sergeant Plummer's lack of bystander liability. In plaintiff's opening argument, he suggested that there may be some direct liability as far as excessive force when it comes to the arrest of Kristen Gunsey. There's simply no evidence of that in the record. Sergeant Plummer arrived to the scene and observed Kristen Gunsey standing by herself of her own power at the back of her vehicle, put handcuffs on her, explained the charges to her, and then took her back to his police vehicle. There's no allegation that Sergeant Plummer threw Miss Gunsey to the ground. But he did arrest her. He did arrest her. That's correct. And he had warrants. Correct. There were two warrants. Two warrants. One of them was unlawful flight to avoid prosecution. Correct. And the other was a parental kidnapping type charge. So there's no evidence in the record of any kind of unlawful use of force against Kristen Gunsey who had lawful warrants and was arrested pursuant to those. As far as Brianna Gunsey, plaintiff makes two arguments as to bystander liability there. The first argument is that Brianna was being manhandled, and the second is that Sergeant Plummer should have been able to see that she was being detained against his will. Again, focusing on that five minutes that Sergeant Plummer was present at the scene, the facts just do not support that he had any knowledge or saw anybody do either of those things. There's no evidence in the record that Sergeant Plummer saw Brianna manhandled or touched by anybody. He denies seeing anything of that nature. He denies hearing anybody tell her that she was not free to leave. Even Brianna in her deposition said that nobody physically touched her before the time that her mother was placed in handcuffs by Sergeant Plummer, who then left the scene after placing Kristen Gunsey in handcuffs. At what point was Brianna touched by the officers? According to Brianna's deposition, she was moved. Officers took her by the upper arms or shoulders and moved her somewhere, perhaps within the first five minutes or first ten minutes. She said that nobody touched her before her mother was placed in handcuffs. So it's unclear when or if she was moved. Did she testify that they pointed guns at her? Yes, she did, Your Honor. She testified that in the first 30 seconds or minute of the interaction with police officers, there were guns pointed at her, but that the guns then went away. Was that Brianna or Kristen? Both of them testified to that. Both of them said they put guns on her. Correct, correct. And Brianna said that the guns went away after less than a minute. Were the guns necessary? Your Honor, I would say that the guns were justifiable, if not necessary. Why? Because Brianna or Kristen Gunsey had two valid warrants for her arrest, and officers are – They weren't for parental kidnapping. They weren't for violent crime. That's correct, Your Honor, but this would be a situation where officers would be given leeway to point their weapons at the purported kidnapping victim. Your Honor, so there are two distinctions to make. The first is that there's a dispute. I mean, Brianna was the kidnapping victim. That's correct, and case law – So they point – I guess she pointed a gun at somebody. She probably thought she was being arrested, too, didn't she? I don't know what she thought, Your Honor, but there is case law to say or to support the view that in arresting a driver of an automobile, you can detain a passenger, you can remove a passenger from a vehicle. In this instance, if there were – What about drawing guns? Your Honor, I believe that that falls under the discretion that's given to police officers at the time of effectuating an arrest. But if you're serving a warrant, there's a warrant out, and you know the warrant is for the mother of the kidnapped daughter. You know exactly why you're there. There's no dispute. Nobody's saying they don't know who is whom there. They know who the mother is. They know who the daughter is. And even if you justify it, as you say, pointing at the mother, why in the world would you point a gun at the head of the daughter? And then she says, order her out of the car and gun her. I mean, where does that come from? Well, there are a couple points in Your Honor's question. So the first point is that I should say at the outset that there is a – there's a dispute as to whether guns were drawn at all. That's what I'm testing you on. I mean, how do we view that? Well, that goes against you. The disputes resolved in favor of her. That's correct, Your Honor. That's correct. The gun was pointed at her head. That's correct. That's correct. So we assume that – We assume that that's the fact for the purposes of this appeal. Correct, Your Honor. Let me take that as a fact. The gun was pointed at her head. She was ordered out of the car and gunned her. And this is the daughter. And it seems to be a fact. They know this is the daughter because they know why they're there. They've been waiting for them. They know exactly what's happening. They told all the facts. Even got the father and the grandmother that can identify who it is. So it's not like they're pulling a gun thinking, well, this is the mother or the daughter. Clearly, they're doing this to the daughter. It's a gun point. Yes, Your Honor. And the response to that would be that the officers in this case were effectuating an arrest of Kristen Gunze. And to the extent that guns were out, they were out for approximately 30 seconds, as the officers assessed the scene. I got that. They were effectuating an arrest of Kristen. It's the daughter that seems to be a problem, at least in terms of how it was done. I understand, Your Honor's point. I mean, it cannot be said that police practice anywhere that you would go and the victim of a kidnapping, particularly when it's a mother-daughter type situation, where you are, as Mr. Wilkinson pointed out, this is a parental type and there's no violence. Everything is indicating the mother is complying. Apparently surprised by it, but nothing has indicated any type of movements or doing anything other than to comply with what is being asked to be done here. And they pull out guns on the daughter, according to the daughter, at least. And we've got to tell you it's true. Then they, she says, they water her out at gunpoint out of the car. So I don't think that that is the facts that were developed in discovery are not consistent with that entirely. So what Brianna testified to and what Kristen testified to was that there were guns out in the initial officer's approach, and then they went away. And the guns were put away immediately once the, at least what Brianna says, is that once she got out of the car, the guns were put away. So this was a situation where, comparable to other cases in which officers are making an arrest, they're sizing up the situation, there's discretion given to the officers to assess the danger of the situation. In this case, as soon as the officers, at least presumably based on how quickly the guns were put away, as soon as it was determined that nobody was resisting, there was no danger to the officers, the guns were put away immediately. It was just on that initial approach when no officer could be sure how this arrest was going to go down that Brianna alleges that guns were out. Thank you. Thank you. Thank you. Mr. Felsen. Your Honors, good morning. May it please the Court. My name is David Felsen, and I represent Dr. Robert Moziani in this matter. I have to start out by saying that this is the fourth form in which these claims against Dr. Moziani have been alleged. This is the third form in which we have litigated the issue of subject matter jurisdiction. And with all due respect, that is the only issue that is before this Court. It is the only issue over which the district court made its ruling. And we can test vigorously any allegations against Dr. Moziani, as were stated by appellant's counsel, in terms of factual issues. Dr. Moziani has never even filed an answer in any claim, including this one. There were two claims that were filed, two types of claims that were filed against Dr. Moziani. One was a federal claim pursuant to 42 U.S.C. 1985. That was dismissed for failure to state a claim. That is not before you. No one can test that. They're only remaining state claims, and they were for intentional affliction of emotional distraction, invasion of privacy, and civil conspiracy. The only issue is whether or not the district court had jurisdiction or decided to assert jurisdiction over those state claims. Those state claims have been made in the circuit court for Montgomery County. The circuit court for Montgomery County determined, actually, if my recollection is correct, at least twice, but possibly three times, that those matters, those various claims, those allegations, needed to go to health claims arbitration, pursuant to the Maryland statute. It is mandatory. It is a subject matter jurisdiction prerequisite that they go to health claims arbitration. As you heard appellants counsel admit, they did not go to health claims arbitration. The complaint in this matter, not the amended complaint, but the complaint in this matter, was filed on the last day of the statute of limitations, the period of limitations, where the case could be filed. The court, the district court, having resolved the federal claim, then looks at the state claims, and whether we look at the judge's original order or we look at the order that related to the motion to alter or amend, the court declined to assert jurisdiction. In the original order, the one from January of 2015, the court found, and I give credit to appellants counsel for creative argument, but appellants counsel has conflated several issues here. The only issue concerning any kind of estoppel that was before the district court was on the issue of subject matter jurisdiction, that that issue had been litigated in the circuit court for Montgomery County. It was litigated as to the nature of the claims, as to the names of the claims, and as to the obligations to go to health claims arbitration. And Judge Motz rightfully said, that issue, subject matter jurisdiction, has been resolved, and we're not going to relitigate it. More importantly, the appellants come forward now, or after that ruling I should say, and file a motion to alter or amend, claiming that we have now been to health claims arbitration. And they submit an order called an order of transfer. That order of transfer, the claim in health claims arbitration, was not filed until well after the statute of limitations had run. And the order of transfer doesn't transfer the matter to a court.  It can be transferred to any U.S. district court or a circuit court that has proper venue. It is the satisfaction of the jurisdictional prerequisite. However, that wasn't presented until after Judge Motz's original order. Yet, according to appellants, that existed before. So they came in on a motion to alter or amend, not with new evidence, but things that they had in their hands. Regardless of that issue, in Judge Motz's opinion, relative to the motion to alter or amend, Judge Motz said, these are state claims. I am declining to assert supplemental jurisdiction over these state claims. And that is judged on an abuse of discretion standard. That's in note six, I believe, of his claim. Was he sued for malpractice? My client, Your Honor? No, he was not. Actually, I apologize. I believe in one of the earlier complaints in the circuit court for Montgomery County. In this case? No, sir. He was not sued for malpractice. He was not. However, these... I'm sorry, Your Honor. Thank you, sir. Thank you. Excuse me, Mr. Smith. You have some time. Good morning, Your Honors. I represent... My name is Paul Smith. I represent Metten-Gunsay and Linda Moyer Williams. And I have a few things to say. If it pleases the court, while my clients are intimately involved in all of these, the issues before the court with respect to Metten-Gunsay and Linda Williams are really only the procedural issue on jurisdiction where Judge Mott declined to exercise supplemental jurisdiction, in this case, on the state claims. And I would just submit very generally that I think he made the right decision. Under 1367C, there are four different elements that can justify not exercising supplemental jurisdiction. And two of them apply, perhaps three. Judge Mott indicated that this was a novel and complex case. That satisfied number two, I believe. And that exceptional circumstances existed that would warrant it. That would be number four. Number three is that all other claims are disposed of or dismissed. And I would just say I think it is a complex and novel case. It is rather complicated. It goes way back 20 years. It should be pointed out that there were conflicting custody orders. That appellant's case, really, they hate to acknowledge that, but there were the conflicting custody orders. And the one from Utah is entitled to full faith and credit in Maryland, whereas the Canadian order has comedy. It has to satisfy. And that pertains to the two counts against my two clients. One was invasion of privacy, and the other intentional infliction of emotional distress. And so if it did go back, it would be rather complex and novel, I believe. In terms of the exceptional circumstances, as my fellow counsel mentioned, this is the fourth case that I've been involved in with these two clients. They have spent thousands of dollars. We had two cases initially in the circuit court for Montgomery County. We had another one in Baltimore. Together, there were about 18 different counts. And then later, there was one in the U.S. District Court. And as this proceeded, we have never filed an answer in any of these either. Motions were filed, and we prevailed on some of the motions. And before a decision could be made to dismiss or resolve other counts, the appellants just voluntarily dismissed them. But from my client's point of view, they've spent a lot of money, and it's really, I think it's an abusive process for them. They could have resolved it before, but when things look like they're not going their way, they would dismiss. And so now, here we are. And the Supreme Court, in the United Minors case, indicated that considerations of fairness, judicial economy, are those that are warranted, and they would certainly apply in this case. Thank you. Thank you, Your Honors. Counsel, you have some volatile time. Could you tell me when this arrest of Kristen Guernsey took place? What date did Kristen Guernsey's arrest take place? Sorry, Your Honor. That's all right. Thank you. Can you give me a general estimate? How about April 2011? Yes, sir. I'm sorry. Why has it taken so long for this to get up here? I mean, you're talking about six years. Your Honor, I can't speak to a lot of things that happened before, because I wasn't involved in the other previous litigation. I only got involved in this right near the end of the statute of limitations period. So when I filed, it moved rather quickly once I filed. But to be honest, I just don't know what was going on prior to getting involved. It seems to me in one way or another that a lot of these actors have been in litigation their whole lives. Well, it does appear, especially in terms of the custody. But, you know, that's the whole thing. I think that the trial court and others here have tried to make this a domestic dispute, and this wasn't a domestic dispute. This case had moved on. The custody stuff was not relevant at the time this young woman was 20-some years old. That was behind everybody. That was in the past. It was done. This involved getting involved in a grown-up's life, and now you're trying to rewrite history. And in doing so, you're affecting her life adversely. Judge Wynn asked about what happened to the warrants. Well, as I said, we believe that the warrants were bogus from the beginning, and it's proved out. Nothing happened with them. They were ultimately dismissed because there was no validity to the warrant. But they were valid on their face as far as these officers were concerned at that time. And that I can see. They were valid. The officers had no reason to look behind the four corners of the document to make a determination as to their validity. What reason do we have to believe? So some of these pleadings and accusations seem very conclusive. What is the worst thing that you contend happened to Kristen? The worst thing that happened to Kristen was that she was subjected to the arrest. That was the worst thing. She was subjected to the arrest, but they had the arrest warrant. Well, you're asking the worst thing. But she was validly arrested. Right, but that's the worst thing that happened. Now, the worst unlawful thing that happened was the use of excessive force. Again, she's stopped. She's put at gunpoint. There's no act of resistance. There's complete compliance. She's yanked from the car. She's thrown to the ground. She is treated just as if she is a vicious criminal, and that just wasn't the fact. When you say she was thrown to the ground, was there resistance in some way? None. Absolutely none. Complete compliance. She never even talked back. I mean, she never even did anything other than stop. She was told, did as she was told. They opened the door. They drug her from the vehicle. They threw her on the ground. Totally unnecessary. And as a result of that, were the—because one of the—some of the claims are a little conclusive here, but what evidence was there? Were there bruises or any broken bones, or were they just bruises or bruises? No, there were no broken bones. She indicated that there was bruising, and her clothes were disheveled, and her pants fell off. But in this case, force—when there is no need for force, any force used is unreasonable. Force without reason is unreasonable. Did Breonna support her mother's story? Absolutely. That's what she testified to, just as her mother testified about what was going on with Breonna. And in regards to Sergeant Plummer, Sergeant Plummer put this team together. Sergeant Plummer took these people to the scene. They said there was nothing else going on. He wasn't there for Hunchtown. Well, he wasn't there because he left. He heard her, and he heard when she was corralled and asked about talking to her father, and he heard her say emphatically, no. His testimony is, I got out of there. But what Christian Gunsey says is before he got out of there, he went back to Breonna and took her cell phone. And so it's not like he didn't know what was going on. This is his team. When he took her cell phone, what are you talking about? Sergeant Plummer. What was he taking her cell phone for? I don't know. That's the whole point. He went back and he took her cell phone. He kept it? I'm sorry? He took it from her and kept it? Yes, sir. And like they said, this was an impound on the vehicle. The car was parked. Had she taken pictures of him or something? I don't know. We don't know why he did it. Just like we don't know why they took everything that was in the vehicle, why they took the passports, why they took Christian's cell phone, why they took all of their documents from the vehicle. None of this was justified. Impounding the vehicle wasn't justified. The vehicle was parked in a lawful parking space in a private parking lot. What was the worst thing that happened to Brianna? Oh, that she was subjected to a horrible seizure and forced to talk with someone that she was deathly afraid of, her paternal grandmother. And they tried to force her, as she testified, tried to force her to get in the car with a man that she had indicated had abused her in the past and she believed was a rapist. And those were the most... Her father? Her father. And so this is what the police were trying to do. There's no reason for those people to be there. There's no reason for them to stay after Christian is gone. But yet Sergeant Plummer leaves his team with this young woman to do what? With Menton Gunsey and Linda Williams to do what? And it was only... Was there any physical contact with Brianna other than moving her into the car? She indicated, her mother indicated they were pushing and shoving her and that's one of the things that she told Sergeant Plummer, that her daughter was very ill and she could not be pushed and dragged around like they were doing. When she told him that, she told him to shut up. I mean, he told her to shut up. We'll tell you about it later. And all of that is in the joint opinions of 602-607 where she talks specifically about what Sergeant Plummer did, what he saw, and what she told him that she was doing. There's no question that Sergeant Plummer had an opportunity to intervene here. It was his team. He left them there and there was no legal justification for those folks to stay there. May I ask the courtroom deputy, what does this static have to do with? I hope it's not me. I don't know yet. What? Not sure. Trying to figure it out. Okay. Well, Mr. Latimer, your time is up. Do you have one final concluding statement you want to make? Yes, sir, if I may. This is a situation where this just was everybody doing all the wrong things for all the wrong reasons. There was no justification for a doctor to contact someone that someone involved in his patient's life without talking to her. There's no justification for Merton Gunsey and Linda Williams to be at that scene and involving themselves with that child or young lady. There's absolutely no reason for the police to act as they did in trying to force a domestic situation when they are law enforcement officers. And there's no justification for any force being used against either of these two young women when they were completely compliant and posed no threat to these officers. Thank you, sir.
judges: J. Harvie Wilkinson III, Robert B. King, James A. Wynn, Jr.